Good morning, and may it please the Court, my name is Eric Miller, and I represent the appellant J.R. Simplot Company. The District Court erred in interpreting the operating agreement between Simplot and Washington Potato Company so as to allow Washington Potato to buy out Simplot's interest in PASCO processing for a purchase price of zero. And the fundamental interpretive error of the District Court involved whether there was a deadlock in this case. Deadlock isn't just any disagreement, not just any impasse between the parties, it's a defined term in section 12.13 of the operating agreement. And there are two parts of the definition of deadlock that are important here, and that we're not satisfied. The first is that a deadlock must be about, quote, a matter for which a majority of the votes of the Board of Members is required. And the second is that in order for there to be a deadlock, such matter, quote, is not approved as a result of a tie vote of the Board. Neither of those things happened here, and if you agree with us on either one of those points, that would be a sufficient independent basis for reversal. Now, as to the first, whether this was a matter for which a majority of the votes of the Board was required, the issue that was being debated was whether there should be a capital contribution from the members in Tupasco. And capital contributions are not a matter for a majority vote of the Board. Capital contributions are governed by section 3.4, which is entitled Additional Contributions. But that provision, counsel, talks about the members need to basically make a capital call. But I have trouble, and maybe you could jump to it if you would, section 6.3 defines the Board of Members, and it says there that the members of the company shall vote their respective percentage interest through the Board of Members. So when I read your brief, it seemed to be the implication that the members acted independently, or could act independently, but I didn't see any evidence in the record that there was a course of them doing that. And when I looked at this definition, it seems to say, and it does use the word shall, that the members shall vote through the Board of Members. So what am I missing there? So the provision of section 6.3 that Your Honor is reading means that the protection that the members have on the Board is that they get to pick three members, and those three members are, that's what they get. And if the members go off, if the Board members go off and do something that the member doesn't like, that's too bad. The member is bound by it because the members shall vote their interest through the Board of Members. It doesn't mean that the Board of Members are the same as the members. And in particular, it doesn't mean that the representatives can necessarily bind the member as a company. And in the case of Simplot, the Simplot Board members were not officers of Simplot. They didn't have authority to bind Simplot. And to the contrary, as members of the Board of members of PASCO, they had a fiduciary obligation to PASCO. So they're on the Board as fiduciaries of PASCO, voting in what they think is the best interest of PASCO. And there is a distinction in the agreement between the members and the Board of Members. That's why throughout we, and in 3.4 being a... There's a statement that says that the members shall vote through the Board of Members. And there isn't a comparable provision. And the way I got here is I was looking for minutes or a course of practice where the members actually did that. And I don't see it. And I think the confusion is whether the members can take any action separate and apart from the Board. It seems from the language that Judge Christian is quoting, that they have to take action through the members of the Board. Well, I take your point, Your Honor. And I think the answer to it is found in the numerous provisions of the agreement that refer distinctly to the Board and to the members. And so if, you know, in a world where, you know, a vote of the Board is enough, 3.4 would look quite different. And it would just say, you know, if the members' representatives on the Board vote for it, that's enough. But it gives an independent... It doesn't say that. It gives an independent role to the members. It makes no reference to the Board at all. And then the contrast, I think, is really highlighted if you look at the next provision, 3.5, which governs another way that you could infuse money into the company is through a loan. 3.5 is about loans. And 3.5 says that a member can make a loan. And obviously the member making the loan has to agree to it. But then the requirement is not that the other member agree, but that the Board agree. So in that provision, there is a role for the Board. In 3.4, there isn't a role for the Board. And I think, you know, an important thing to keep in mind here is, you know, for all of the formality that's expressed in the agreement, there are only two members in this company. So Simplot and Pasco. So if they want to get together and agree to make a capital contribution, they can just do that. They don't need to go through a formality of a Board vote. There's either one of them doing that, not getting together to do that. I didn't mean to interrupt you. So assuming we agree that the members can do things on their own per 3.4, and we know that the Board of Members can do things on its own, opposing counsel refers to 5.2 saying the manager can, 5.1 and 5.2, the manager can do things on its own. As I understand the argument, is that the manager, that the most reasonable way to read 5.2L is that the manager would have authority, with the written approval of the Board of Members, to set requirements for additional capital contributions. And they argue that if we don't read it in that way, then the language without the written approval of the Board of Members would be meaningless. Can you address that? Absolutely, Your Honor. As you are aware, and as you just said, 5.2 is a limitation on the manager's authority. It's not an independent grant of authority. But it's a double negative. And the point is, if you take out the double negative, then the suggestion is that the manager does have the authority with the permission. So the argument that's been made by Washington Potato is that there's a negative implication from 5.2. And it is, we suggest, a weak negative implication for a number of reasons, one of which is the last phrase in 5.2L, which is, in accordance with Article 3 above. It says, agreed to by the members and the Board of Members in accordance with Article 3 above, which does two things, right? One, it suggests that, contrary to your first argument, that the Board of Members have a role in Article 3. Well, so the clause as a whole says, you know, setting requirements that are not approved in the annual business plan and or agreed to by the members and the Board. And the annual business plan, which is in 8.1, is proposed by the members and then voted on by the Board. So if you're getting capital through the annual business plan, then there is a role for the— agreed to by the members and the Board of Members in accordance with Article 3. How is that consistent with your theory? Well, I mean, to some extent it depends on how you read the and or. And insofar as the and or is referring back to the annual business plan, that's one reason that the reference to the Board of Members would be in there. And if you think it has to be something more than that, which we don't, but if you read it as something more than that, then we would acknowledge that there is an implication that perhaps the Board has some role. But that implication is cut off by the next phrase there, which is in accordance with Article 3 above, because when you look back at Article 3, the governing provision on capital contributions, there's no role for the Board. So— Though it does have that preliminary language, except as otherwise provided herein, which could take in almost anything you wanted, right? Well, it does say that. And I think, Your Honor, that the most natural reading of that is as a reference to the other parts of Article 3 relating to putting money into the capital, like the provision for loans, like 3.6, which relates to adjusting the members' capital accounts for tax purposes if certain transactions take place. One could imagine somebody arguing, well, gosh, that should be treated as a capital contribution that requires unanimous member consent, and the except as otherwise provided makes clear that we're not displacing 3.5, 3.6, the other parts of Article 3. Is it your position that if one member wanted to make the capital call and one did not, that a deadlock would not, could not, could not arise in that circumstance because of your read of Article 3? That's right, Your Honor, and I think I do want to make clear— Wouldn't that leave one member in the position of starving out the other member? No, not at all, Your Honor, because there are a lot of other ways to get money for the company, right? They could cut expenses, sell assets, there could be a loan. Those other mechanisms involve Board action. And so if they try to do that and the Board deadlocks, then we have the deadlock provision. But, you know, the deadlock provision is strong medicine in this agreement. It gives Washington Potato the hammer of the right to a forced sale that in this case was for a price of zero. And to use that to circumvent the protection of Article 3.4, I think, is not a reading that's consistent with the thrust of the agreement as a whole because 3.4 is a very important limitation on the member's risk. It says that, you know, you've put in a certain amount of money and maybe you'll lose that, but you're not going to be required to put in anything more without your permission. So that's a key protection for both of the members and in particular for Simplot, which doesn't have the right of the forced sale. And so to say that you can circumvent that by, you know, giving the Board a role in that capital contribution process such that you can then engineer a deadlock, it would be to read that protection for Simplot out of the agreement. But even if you think that the Board does have some role in the process, the district court's analysis would be erroneous for the second reason I said at the beginning, which is that the failure here, the failure to contribute capital, was not as a result of a Board vote because whatever the role of the Board is, everybody agrees that at the end of the day, a capital contribution requires the agreement of the members. And there's no dispute here that Simplot did not agree to make a capital contribution. The joint written consent that Washington Potato had proposed for the parties to sign to put in capital, and this is at page 416 of the ER, had a signature line for Simplot and for Washington Potato, as it should have. And Simplot did not sign, as it had a right not to do. And that's the reason that there was no capital contribution made. And that's what prompted my first inquiry. Do we have anything in the record that shows other instances where that was the course of conduct, where the members signed or adopted, approved, or acted separate from the Board of Members? Because I was definitely piqued by the two signature lines. Your Honor, it's my understanding that this was the first time in the history of the company that there had been a discussion of making a capital contribution. Well, whether it was capital contribution or not, anything that we've got where the members acted unilaterally. I'm not aware of any other, but the capital contribution is the key thing that would require member consent. Thank you. And if I could, I'd like to reserve the remainder of my time. Of course. Thank you. Good morning. May it please the Court, I'm Steve Rumage, and I'm appearing this morning on behalf of the plaintiff and appellee, Washington Potato Company. And before I dive into the language of the agreement, I want to kind of get us a reset on the background of this because it matters, I think, in interpreting the agreement. When the events that we're talking about here today were unfolding in the fall of 2016, no one, no one disputed that consideration of capital requirements was an appropriate thing for the board to do. And no one at the time when it mattered disputed that that could give rise to a deadlock. Indeed, in deposition testimony, the president of Simplot conceded that that was the case. And Simplot simply did everything it could to prevent the board from considering the capital requirement issue. It didn't show up for meetings. It didn't respond to correspondence to the point where the district court found it acted in bad faith. And at that point, after it successfully prevented any discussion of the question of capital requirements, it pivoted to the argument that Your Honors heard here today. It wasn't an argument that was being made in the fall of 2016. And that argument, we think, ignores the structure of the operating agreement. We think it contradicts the words of the operating agreement, and we think it would frustrate the purpose of the deadlock provision, which was, in fact, to resolve exactly this kind of disagreement. But it's also consistent with a party who thinks that this operating agreement required both members to insist upon or to agree upon an increased capital call, because otherwise you get to deadlock and they get to write what they get, which would have given the other member a huge advantage. I think it's not entirely. And in that regard, I would particularly direct the court's attention to SCR, I think it's 5 and 6, which is a letter from Simplot's counsel in December of 2016, in which he says, I'm reminding you that the board consent is not effective until the last board member signs it. To me, that tells me that that is an appropriate subject for board consideration. So why did the resolution have signature lines for both members? I think that's a fair point, Your Honor, and it's interesting. Again, we have to get ourselves back in the mindset of fall of 2016 instead of spring, winter of 2019, because in the fall of 2016, there's no evidence that the folks at Washington Potato thought this was controversial at all. This was a lender who came to the company and said, you know what, you're out of covenant, here's the solution, put in capital. It was the furthest thing from Washington Potato's mind that Simplot would say, no, forget it. And so that resolution, Your Honor, was designed to kill two birds with one stone. Why? Because — Oh, forgive me. Forgive me before you get that. So that was drafted before there had been the meeting where there was a no-show? It was drafted the day of the meeting. In fact, I believe it was sent to — Before or after they didn't show? I can't tell you whether — Okay. — what part of the day it was drafted, but it was sent to Simplot on October 28th, which is the day of the meeting they didn't show up for. And the reason it's drafted that way is because the board's responsibility, because the board is the entity that is essentially the body that makes business decisions, along with the manager, for PASCO processing. The board's responsibility is to say, we need capital. Lender has said, we need capital. Section 3.4 then kicks in, and it says, members, you are not obligated to supply capital until you agree on two things, terms and proportions. It doesn't say — that's one of the interesting things. I'm going to leap ahead in my argument, Your Honor, because I wasn't going to get here for a couple minutes, but let's talk about Section 3.4, which is where Simplot's argument pivots. And if you listen to Mr. Miller characterize Section 3.4, it sounds sort of like the suggestion is that 3.4 says only the members get to set capital requirements, but that's not what the words say. The words say, no member shall be obligated to contribute capital unless the members agree on the terms upon and the proportions in which the capital contributions will be contributed. So that suggests that there is some external obligation that, without this clause, might bind the members to contribute more. And it simply says you're not going to be required to contribute more until you agree on terms and proportions. And so the resolution that Your Honor pointed out to me a moment ago not only calls for the capital to be accepted by the company, that's the board's job, company, you need to take the money, but it also says the members are doing what they need to do, which is agree on the terms and the proportions, because it says $3 million from each and it gives a date, terms and proportions. So this is all reflective of a process where the board of members is going through and authorizing the receipt of the additional capital and the members are doing their job in their interest of agreeing on terms and proportions. And since we're talking about, you know, exactly how this unfolded in fall of 2016, I want to put this in the context of what would a manager coming to this agreement and confronting the problem that Washington Potato confronted, what would they look at this agreement and conclude? And remember, again, the context is the lender comes to them and says you're out of covenant, you need to put in capital $6 million. So the manager looks at the operating agreement and 5.2L says he can't do it alone. We're all clear on that. But it also says without written approval of the board, and it also refers to unless already approved in the annual business plan, which, by the way, under Section 8.1 is adopted by the board, or agreed to by the members and the board under Article 3. So every one of these options that the manager sees involve the board. And so the manager thinks my first stop has got to be the board.  Because when we construe contracts, we look not just at words in isolation, but how they function in the overall structure. And the board is the LLC's policymaking body that makes business decisions. It approves the annual plan. It decides how much money to distribute to the members. It picks the manager. It's who the manager has to give reports to. It decides accounting requirements. As Mr. Miller just pointed out, if a member wants to make a loan, it's the board of members that negotiates the terms for the company. And most important, when you get to Section 7.1, it is the board of members, and I quote, all decisions concerning working capital requirements will be made by the board. So if you are the manager and you get your lender saying you need $6 million in new capital, where do you go? You go to the board. And so the board meeting is called for October 28th, date, time, and place set by Simplot. Agenda says capital call, first item on the agenda. No one objects to the agenda item. Nobody says this isn't appropriate for board consideration. Simplot just doesn't show up. Well, they asked for more time. They wanted books and records. There's a little more to the story. There is, but when the response comes, they ask for more time, ask for books and records on October 25th. On October 26th, a letter goes back and says, you know, it's urgent. You need to be there. Here's all the things we've given you. We're willing to work with you to give you more. You need to show up so we can discuss this. They literally just don't show. Calls are placed. Where are you? E-mails are sent. Where are you? They don't show. Then they don't engage in early December when efforts are made to resolve the deadlock. A meeting is set on December 14th just to discuss trying to resolve the deadlock. They do not show. They do not show. In fact, a letter is sent to Jams calling for mediation under the deadlock provision. They don't respond by saying this is not an appropriate subject for deadlock. They don't. They say we will not mediate because, as Your Honor says, we still want records. And by the way, they do not argue on this appeal that they have a right to get more records before this process kicks in. And so it's important to understand they thwarted it every step of the way. That's why the district judge found that there was bad faith. And in the course of that, we get the letter from counsel that says exactly what I said to Your Honor a moment ago, that says essentially, remember, this consent isn't effective until everybody signs it. It can't amount to saying this is an appropriate subject for board action. So from the perspective of the people who participated in this, as the events unfolded in 2016, the argument seems like a combination between something surreal and a complete bait and switch because nobody during the time when it really mattered and events could have been changed asserted this. And so at the end of the day, we think the district court got it right when she found that there was a deadlock here and got it right when she found that Simplot did not act in good faith in resolving it. I'm not going to go back to where I was in my outline, which is to talk about 3.4, because I think I've already talked about 3.4 and how that functions in the grand scheme of the agreement. That is, simply allows the member to have a say in terms and proportions. And by the way, just as an aside, because we do have the board making the determination that this capital is necessary, this capital is required, the lenders required it. It's not as though, as the suggestion was from our friends on the other side, it is not as though that means that the other party, the other member can just put their foot down and say, I don't care what's in the best interest of PASCO processing. I'm not putting in money. No, because under Washington law, and the judge summarized this pretty well at page 17 of her opinion. So E.R. 17. Under Washington law, there is a duty of good faith and fair dealing. And so in addressing this capital call, in addressing the finding by the board of members that more money is required, Simplot would have to act in good faith. Nothing in the agreement says they may turn down that call in their sole unreviewable discretion. So they're subject to that. The second argument that Simplot makes is essentially this is not really a board dispute. It's a member dispute. As Your Honor points out, it would be shocking if we had the board dividing to the point of a deadlock where there wasn't a member dispute. That will always be the case. For exactly Your Honor's reasons, Section 6.3 contemplates that each member is going to be voting their respective interests through the board of members. It's also hard for me to imagine that where there's a 50-50 ownership and a dispute between the members, that that wouldn't be subject to a deadlock provision. But I think, as I understand it, until the operating agreement was amended, that is, in fact, the situation. They didn't have a deadlock provision. Is that right? No, that's correct. And the operating agreement was amended in 2013. And that's interesting historical context, too. Because one of the main subsidiaries of Pasco Processing is a company called National. And Washington Potato was buying National. Simplot wanted in on the deal. And Washington Potato said, okay, we will let you in on the deal, but here's a condition. If we stop getting along, we need to have the right to buy you out at an agreed price. The exact quote is, I had to know that if Simplot and I ever stopped seeing eye to eye, that I had the right to buy them out at an agreed price. And that's conceded. And so you're right, Your Honor, there wasn't a deadlock provision until then, but there was after 2013. Also worth noting that when that deadlock provision was negotiated, and this is because of the first sentence in Mr. Miller's argument I want to address, that formula price was set by the parties. And so whatever price Washington Potato paid at closing was exactly the price that was negotiated between it and Simplot, one of the largest privately held corporations in the world. And so the question of whether they paid a dollar, a million dollars, is off the table at this point. It's the price that the parties agreed. And when the deadlock arose and the buyout provision kicked in, Washington Potato did not have a choice, right? It wasn't in a position then to say, oh, well, I'll give you, you know, an extra $50 million. There was a negotiated price, and indeed, if Washington Potato had passed on the buyout, this is another thing that's sort of overlooked in the last argument. If Washington Potato had passed on the buyout, that right would have passed to Simplot at exactly the same price. So when that deadlock arose, when Simplot thumbed its nose at the opportunity to have a mediation where we would resolve these issues, basically Washington Potato was in the position it had to exercise the buyout price because otherwise that was going to pass to Simplot. And the last point that I want to address is the textual analysis that was offered concerning what the meaning is of 12.13 and whether that refers to or that refers only to matters on which board approval is required. The first sentence of 12.13 has to be read in its entirety, and what we heard from a moment ago was just the beginning of 12.13, because 12.13 starts by saying that a deadlock shall occur with respect to any matter for which a majority of the votes of the board of members is required for approval, any matter. It then concludes at the end of that sentence by saying when a tie vote occurs, and that says a tie vote occurs on a matter submitted to it, that is the board, at a meeting or in the form of a proposed written consent. So what Simplot wants to do is to read into those expansive words, any matter and a matter submitted to the board, essentially a qualifier that says any matter on which board action is required and on which a majority vote is required. That's not in the words of the contract. They're importing something into the contract. The reference to where a majority vote is required harkens back to Section 6.9 of the agreement, and 6.9 says unless otherwise required by law or the agreement, the vote of a majority in number of members of the board is necessary, required, for there to be a valid act or decision of the board. So 12.13 simply says that when it's a majority vote that's required and there's a tie 3-3, there's a deadlock. Obviously, that's not going to occur in circumstances where a majority vote isn't required, such as where it's a supermajority or a unanimous vote. But that's not at issue here because nobody claims that the matter that came before this board didn't require a majority vote. Finally, I see I only have 20 seconds left, so I'll just conclude at this point, Your Honors. It seems to us that the deadlock clearly arose under the operating agreement. Members don't set capital requirements. That's exactly the sort of decision that when you look at the structure of the agreement as a whole, the board does. And under 6.9, the capital call decision, the vote would be valid only if there was a majority. That matter failed because of a 3-3 tie. That meant Section 12.13 kicked in. And there is no question but that Washington Potatoes scrupulously followed that every step of the way. That is exactly what the district court found. Indeed, what she concluded was, and I quote this because it's a colorful way of looking at it, if a conflict looks, walks, and talks like a deadlock, it is a deadlock. And that's what happened here. We had two parties in a position where, as Judge Kristen said, one could starve the other out. And this provision was designed to address exactly that situation. We ask that the court affirm. Thank you, Your Honors. Thank you. I think you have some time left for rebuttal. Thank you, Your Honor. I have just two points. The first is with respect to the issue of Simplot's good faith in the course of dealing leading up to this series of events, the district court's discussion of the duty of good faith and fair dealing was in connection with a different issue from the one that we're discussing here. The district court was talking about whether there was a condition precedent to the exercise of the agreement to purchase. And I think it's fair to say, looking over the sequence of events here, that there had been a breakdown in the relationship between the parties. Simplot simply didn't trust Washington Potato anymore. We had asked them for financial information to explain why it was that there was suddenly this need for an infusion of capital. We didn't get the information that we wanted, and that's the reason for Simplot's not attending the meeting. The second point I want to make is there is a fundamental tension in the interpretation of the agreement offered by Washington Potato Company, and that is, are the board and the members separate from each other or are they not? Because when they're talking about whether this is a matter that requires some role for the board, they say, well, the board and the members are different things. 3.4 talks about the members, but there's also a role for the board. That's their position. But then when we ask, well, why was capital not contributed here? What was the disagreement? Wasn't it really just a disagreement between the members? And at that point they say, well, no, it's really all sort of related, and if there's going to be a disagreement among the members, it's going to necessarily be a disagreement among the board, and it's all the same thing. And it seems to me that they can't have it both ways, and the correct way to look at it is what the agreement says, that even if you think that there is some role for the board here, the disagreement here was a disagreement between the members, whatever else it might have been, and it was because of the disagreement among the members and not because of anything the board did or didn't do that capital was not contributed. That's how they characterized it in the complaint. They said there was a disagreement between the members. That's what their consent form reflects. And that kind of disagreement, one between the members exercising their prerogative under 3.4 to say no to a further infusion of capital, that's not within the meaning of 12.13, and it's not subject to the deadlock provision. And if there are no questions, we ask that the judgment be reversed. Thank you for your argument. The case of Washington Potato Company v. J.R. Simplot Company is submitted, and the court for this session stands adjourned.
judges: Ikuta, Christen, Choe-Groves